Hearing Date:     November 3, 2014 at 10:00 a.m.

PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569
Seth H. Lieberman
Robert M. Fleischer
Telephone: (212) 421-4100
Facsimile: (212) 326-0806
slieberman@pryorcashman.com
rfleischer@pryorcashman.com

Attorneys for 71 Clinton Street Apartments LLC

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X

In re:

71 CLINTON, INC.,

                               Debtor.

------------------------------------------------------------------------X

Chapter 11

Case No. 14-12830 (SCC)

**REPLY OF 71 CLINTON STREET APARTMENTS LLC IN
FURTHER SUPPORT OF MOTION FOR ORDER EXCUSING RECEIVER FROM
COMPLIANCE WITH TURNOVER REQUIREMENTS AND ESTABLISHING
POWERS AND DUTIES OF RECEIVER PURSUANT TO 11 U.S.C. § 543(d)(1)**

      71 Clinton Street Apartments LLC ("CSA"), by and through its undersigned counsel, submits this reply ("Reply") in further support of its motion [Dkt. No. 8] (the "Motion") for entry of an Order Excusing Receiver from Compliance With Turnover Requirements and Establishing Powers and Duties of Receiver Pursuant to 11 U.S.C. § 543(d)(1) and in response to the objection [Dkt. No. 12] (the "Objection" or "Obj.") filed by 71 Clinton, Inc. (the "Debtor").[1] This reply is supported by the affidavit of Ari Weisfogel (the "Weisfogel Affidavit" or "Weisfogel Aff."), which is attached hereto as Exhibit "A."

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

**PRELIMINARY STATEMENT**

1.      In its Motion, CSA demonstrated sufficient grounds under 11 U.S.C. § 543(d)(1) for an order continuing the pre-petition Receivership and excusing the Receiver from the turnover and accounting requirements under §§ 543(a), (b) and (c).  Rather than refuting those grounds, the Debtor instead attempts to divert the Court's attention from the undisputed facts that demonstrate that the continuation of the Receivership is in the interests of the Debtor's estate.  Devoid of any supporting affidavit or other admissible evidence, the Debtor seeks to paint the Receiver as self-serving, incompetent and inattentive to his duties.  But the Debtor does not rebut the evidence submitted by CSA, and nothing in the Objection serves to ease CSA's concerns that the Debtor, through Rosenfeld, cannot be entrusted to control the Premises.  The Debtor offers nothing in the Objection to suggest that Rosenfeld would not operate the Premises in a manner that best serves his own interests at the expense of the estate's creditors.  In fact, the Objection only serves to confirm CSA's concerns.

2.      For one thing, the Objection reveals a profound misreading by the Debtor of its own responsibility to operate the Premises, which became effective when the Debtor filed its bankruptcy petition.  Pursuant to 11 U.S.C. § 543, the Receiver was displaced as of October 7, 2014, the Petition Date.  Yet, it is apparent that the Debtor's principal and/or its agents did not enter or inspect the Premises until October 23, 2014, more than two weeks after assuming possession, custody and control.  Even then, the Debtor failed to remedy any of the issues at the Premises about which the Debtor now protests, and instead used its visit to gather fodder for use in its Objection.

3.      Further, the Objection demonstrates that Rosenfeld, now through this Debtor, is prepared to avoid candor as necessary to best serve his own interests.  For example, having

2

reviewed each of the monthly management reports submitted by the Receiver to the Supreme Court during the Receivership, Rosenfeld is aware of the tasks undertaken by the Receiver and his Property Manager in furtherance of the maintenance and repair of the Premises. The Debtor, through Rosenfeld, also is aware that the Receiver did far more than collect rent, as contended in the Objection. Moreover, the Debtor knows (or with only minimal inquiry would have learned) that most of the conditions at the Premises about which the Debtor now complains, including water damage, accumulated garbage, and the refuse on the roof, occurred <u>after</u> the Petition Date, while the Premises was under the Debtor's supervision and control.

## ARGUMENT

**A.    The Debtor Does Not Refute the Grounds Set Forth in the Motion for the Continuation of the Receivership**

4.    In the Motion, CSA recounted various factual bases for the Court to continue the Receivership. The Debtor has not challenged any of these in its Objection. Thus, the facts that serve as a bases for the relief sought in the Motion are unrefuted, and the Court should accept the following facts as undisputed:

(a) The Debtor and Rosenfeld have a history of mismanagement of the income generated by the Premises. While Rosenfeld collected rents from both the commercial and residential units at the Premises, he refused to apply that income towards the Debtor's mortgage obligations. Motion, ¶¶ 11-12.

(b) Rosenfeld ignored the Receivership and interfered with the Receiver's control of the Premises - he collected rents after the Receiver was appointed (in direct violation of the Order appointing the Receiver (Farca Aff., Exh. "A"). In addition, he did not turn over those rents to the Receiver or otherwise account for the rents that he collected. Farca Aff., ¶ 11. Moreover, he failed to turn over to the Receiver or otherwise account for

3

security deposits that he had collected from the tenants at the Premises. Id. ¶ 10.

(c) Rosenfeld continued to lease residential units in the Premises after the appointment of the Receiver, without the Receiver's permission or authority. Id. ¶ 11.

(d) Rosenfeld entered the Premises on multiple occasions without the Receiver's permission, and removed and replaced locks that the Receiver had installed on various rental units. Id. ¶ 12.

(e) In a scheme to divert income from the Debtor to himself, Rosenfeld entered into sweetheart lease deals for 15 residential units, whereunder he caused the Debtor to lease those units to him at well below market rates ($800/month), while subleasing those units to third parties at full market rates ($3,200/month).  Through this scheme, Rosenfeld diverted at least $144,000 in revenue from the Debtor to himself. Id. ¶¶ 13-14.

(e) Rosenfeld illegally operated the 15 residential units that he leased from the Debtor as a hotel/hostel, in violation of applicable law. Id.

(f) Rosenfeld consistently has demonstrated his disregard of the Debtor's contractual covenants under the Consolidated Obligations by, among other things, permitting the Debtor to default its repayment obligations to CSA and causing the Debtor to grant a second mortgage on the Premises. See Motion, ¶ 42.

(g) Rosenfeld has a history of dishonesty and self-serving conduct in the Bankruptcy Court, which includes patently false information in the Debtor's bankruptcy petition filed in this case, as well as documented dishonesty in the Ilana bankruptcy case. See Motion, ¶ 43.[2]  Notably, the Debtor offers no explanation for how it could have listed its debts at

---

[2] While the Debtor addressed Ilana in its Objection, it merely offers a brief and wholly unsubstantiated assertion as to the conduct of the receiver appointed in that case. But the Debtor does not refute the remarks of the Bankruptcy Court in the Ilana case concerning Rosenfeld's lack of candor.  Nor does the Debtor dispute that Rosenfeld was untruthful during the section 341 meeting in that case. See Motion, n.2.

4

no more than $10 million when CSA has a judgment against the Debtor that exceeds $12.6 million. See Motion, ¶ 4.

5.      These facts, which remain unchallenged, demonstrate why it is in the creditors' best interests to continue the Receiver's operation and supervision of the Premises during the pendency of this Bankruptcy Case.

**B.      The Debtor's Contentions Regarding the Receiver are False and Misleading**

6.      In its Objection, the Debtor describes various conditions that its counsel and real estate broker apparently observed at the Premises during a walk-through on October 23, 2014. The Debtor uses these conditions as a basis to attack the Receiver, charging that the Receiver has "horrifically neglected the management of the Property." Objection at ¶ 5. These allegations are both self-serving and baseless.

7.      First, it appears that the Debtor's October 23, 2014 walk-through of the Premises was its first visit to the Premises since the Petition Date. This is particularly disturbing given that the Debtor has been in possession, custody and control of the Premises since the Petition Date and apparently did not bother to inspect or visit the Premises for more than sixteen days. See generally In re T.A.T. Prop., Case No. 05-47223 (SMB), 2009 Bankr. LEXIS 739, at *40 (Bankr. S.D.N.Y. Feb. 20, 2009) ("Ordinarily, the commencement of a bankruptcy case terminates a receivership." (citing 11 U.S.C. § 543)); cf. In re 400 Madison Ave. Ltd. P'ship, 213 B.R. 888, 894-95 (Bankr. S.D.N.Y. 1997) ("the receiver has absolutely no responsibility . . . to perform any other duties which are the prerogative and burden of a debtor-in-possession and a trustee."). Moreover, there is nothing in the record to indicate that the Debtor has taken any steps to remedy any of the problems that it identified at the Premises. The Debtor's post-petition inattention to the Premises certainly belies any notion that it can be trusted with control over the Premises.

5

8. Second, the Debtor has no basis to ascribe blame to the Receiver for the conditions at the Premises that the Debtor observed and photographed on October 23, 2014. The Debtor includes no evidence that these conditions existed on or prior to the Petition Date.[3] Upon information and belief, the refuse on the roof, the accumulated garbage, and the water damage were all the result of an October 11, 2014 roof party at the Premises. Weisfogel Aff., ¶ 6. The Receiver cannot be blamed for conditions that arose after he was displaced.

9. Third, the conditions at the Premises described in the photographs attached as exhibits to the Objection appear to be cherry-picked conditions designed to deceive the Court into believing that the Receiver violated his obligations to maintain the Premises. If the Debtor truly believes that the Receiver caused the Premises to deteriorate, then the Debtor could seek authority to employ an engineer to inspect the Premises and prepare a proper report on the condition of the Premises. Not surprisingly, the Debtor failed to do so.

10. Fourth, the Debtor contends that the notice posted at the Premises by the superintendent (Obj., Exh. "B") is evidence of the Receiver's neglect. However, at all times prepetition, regardless of whether the superintendent was onsite, the Property Manager (Weisfogel) was always reachable by tenants and remained available to maintain the Premises. Weisfogel Aff., ¶7. Indeed, as is evident from the photograph itself (Obj., Exh. "B"), Weisfogel added his name and contact information to the notice in question. Id., ¶ 7. Yet, in quoting the text of the notice in the Objection itself, the Debtor omits the Property Manager's two telephone numbers, fax numbers and email address that were present on the notice. Compare Objection ¶ 7, with Obj., Exh. "B."

---

[3] In fact, based on complaints that the Property Manager received after October 7, 2014, it appears that these conditions first arose on or around an October 11, 2014 roof party at the Premises. Weisfogel Aff., ¶ 6.

6

11. Fifth, the Debtor conveniently fails to reveal in the Objection that the items stored in the vacant apartment belong to and are the personal property of Rosenfeld, remnants from when he unlawfully operated 15 of the apartments in the Premises as a hostel/hotel. See Obj. ¶ 13; Weisfogel Aff., ¶ 8.[4]

12. The Debtor falsely alleges that other than collecting existing rent, the Receiver has "done zero, absolutely nothing, to manage or supervise the Property." Obj. ¶ 14. Yet, throughout the Receivership, the Receiver and his Property Manager arranged for numerous repairs and improvements at the Premises to increase the rentability and rates of the vacant units. Weisfogel Aff., ¶ 9. All improvements were documented in monthly management reports (the "Monthly Reports") prepared by the Property Manager and submitted to the Supreme Court and the Debtor for review. Id. At no time did the Debtor object to the Monthly Reports or any of the Receiver's (or his professionals') acts in connection with the Premises. Id., ¶¶ 9-10. Furthermore, many of the Receiver's repairs and improvements to the Premises exceeded the $1,000 limit set forth in the Receiver Order and therefore required Supreme Court approval. Id., ¶ 11. These repairs and improvements include the following, all of which Debtor consented to and the Supreme Court approved, and which were subsequently completed:

(a) facade inspection/repair work, per New York Local Law 11 (approved January 2012);

(b) roof repairs and maintenance (approved January 2012);

(c) electrical work (approved March 2012);

(d) lobby upgrade (approved April and May 2012);

---

[4] Initially, the Receiver had to account for 15 units full of furnishings, and those units could not be rented until the furniture was removed. See Weisfogel Aff., ¶ 8. Because the Receiver Order did not vest the Receiver with authority to dispose of Rosenfeld's personal property, further Supreme Court intervention was required to allow the Receiver to clear out at least 12 of the 15 apartments to render them suitable for renting. Id.

7

(e) lobby mailbox replacement (approved July 2012);

(f) emergency mold abatement (approved January 2013);

(g) emergency repairs to apartment number 22 (approved February 2013);

(h) remodeling apartment number 13 to make rentable (approved March 2013);

(i) miscellaneous repairs, including remodeling apartment number 16 to make rentable, refresh hallways and stairways, and repair of fire damage to exterior wall (approved December 2013); and

(j) emergency sidewalk repairs (approved October 2014).

Weisfogel Aff., ¶ 11.

13.     The above-referenced items are in addition to the other services that the Receiver and Property Manager performed at the Premises. Throughout the Receivership, the Receiver and Property Manager ensured that the Premises remained clean and in good -condition. Id. ¶ 5.

14.     In addition, the Receiver obtained authority from the Supreme Court to employ a real estate broker in January and February 2012 to assist him in marketing for rental the apartments that Rosenfeld had been operating as a hotel/hostel. Id. ¶ 13. The Receiver successfully rented all but one of those apartments. Id. ¶8.

15.     All of the foregoing items were detailed in the Monthly Reports, which were provided to the Debtor and submitted to the Supreme Court for approval. Id. ¶ 9. In addition, the Receiver regularly granted Rosenfeld's requests to make site visits during the Receivership. Id. ¶ 14. Yet, Rosenfeld never asserted to the Receiver, the Property Manager, or the Supreme Court that the Receiver was neglecting his duties. Id.

16.     Finally the Debtor contends that CSA, apparently in cahoots with the Receiver, is intentionally causing the condition of the Premises to deteriorate as a "tactic" to obtain the upper

hand in a valuation battle in connection with an imaginary stay relief motion. Obj. ¶ 15. The Debtor offers no evidence in support of this farfetched theory, which is patently absurd. The last thing any secured creditor would seek is to devalue or harm its collateral.

## **CONCLUSION**

17. Nothing in the Objection serves to refute the grounds in the Motion for the Court to continue the Receivership. The record demonstrates that if given the opportunity, the Debtor, controlled by Rosenfeld, will operate the Premises in a manner that best suits Rosenfeld's own interests, without regard for the interest of the estate's creditors. Moreover, the Objection demonstrates nothing except that Rosenfeld is willing to continue his established pattern of dishonesty as it suits his interests. The Court should, therefore, grant the Motion.

Dated:   New York, New York
         October 31, 2014

                                      PRYOR CASHMAN LLP

                                      By:   /s/ Seth H. Lieberman
                                              Seth H. Lieberman
                                              Robert M. Fleischer
                                      7 Times Square
                                      New York, New York 10036-6569
                                      Telephone: (212) 421-4100
                                      Facsimile: (212) 326-0806
                                      slieberman@pryorcashman.com
                                      rfleischer@pryorcashman.com

                                      Attorneys for 71 Clinton Street Apartments LLC