|  |  |
|---|---|
| **Hearing Date:** | **May 4, 2015 at 10:00 AM ET** |
| **Objection Deadline:** | **April 27, 2015 at 4:00 PM ET** |

PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036-6569
Seth H. Lieberman
Conrad K. Chiu
Robert M. Fleischer
Telephone:  (212) 421-4100
Facsimile:  (212) 326-0806
slieberman@pryorcashman.com
cchiu@pryorcashman.com
rfleischer@pryorcashman.com

*Attorneys for 71 Clinton Street Apartments LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------------X

In re:

                    71 CLINTON, INC.,

                                Debtor.

-----------------------------------------------------------------------X

          Chapter 11

          Case No. 14-12830 (SCC)

**MOTION OF 71 CLINTON STREET APARTMENTS LLC FOR (I) RELIEF FROM**
**THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §§ 362(d)(1) AND/OR (d)(3) OR, IN**
**THE ALTERNATIVE, (II) DISMISSAL OF THE BANKRUPTCY CASE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................... 1

JURISDICTION AND VENUE .......................................................................................... 2

BACKGROUND ................................................................................................................. 3

    (i)    The Receiver Motion ........................................................................................ 3

    (ii)   The Disclosure Statement, Plan And Initial Purchase Agreement ............................ 3

    (iii)  The Sale Procedures Motion ............................................................................ 5

    (iv)  The Debtor's Failure To Comply With 71CSA's Discovery Requests .................... 8

    (v)   Current Status Of The Property And Indebtedness To 71CSA ............................. 8

RELIEF REQUESTED ...................................................................................................... 9

  A.  71CSA IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY
      PURSUANT TO 11 U.S.C. § 362(d)(3) ......................................................................... 9

    (i)    The Standard Under 11 U.S.C. § 362(d)(3) ........................................................ 9

    (ii)   There Is No Reasonable Possibility Of The Plan Being Confirmed
          Within A Reasonable Time ............................................................................ 11

        (a)   The Plan Has No Reasonable Possibility Of Being Confirmed ...................... 12

        (b)   The Plan Has No Reasonable Possibility Of Being Confirmed Within
             A Reasonable Time ................................................................................. 14

  B.  71CSA IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY FOR
      "CAUSE" PURSUANT TO 11 U.S.C. § 362(d)(1) .......................................................... 17

    (i)    71CSA's Lack Of Adequate Protection In The Property Constitutes Cause
          For Relief To Lift The Automatic Stay ............................................................. 18

        (a)   There Is No Cushion ................................................................................ 18

        (b)   The Value Of The Property Is Declining .................................................... 20

**TABLE OF CONTENTS (continued)**

(ii)    The <u>CTC 9th Ave. P'ship</u> Factors Continue To Weigh
In Favor Of Lifting The Automatic Stay ..................................................................21

C.  IN THE ALTERNATIVE, THIS COURT SHOULD DISMISS THE BANKRUPTCY
CASE WITH PREJUDICE ..........................................................................................26

(i)    Dismissal Is Warranted Pursuant To 11 U.S.C. § 1112(b)(4) ...................................26

(ii)    The Debtor Flouted Its Discovery Obligations ..........................................................27

(iii)    The Bankruptcy Case Should Be Dismissed Pursuant To C-TC 9th Ave.
P'ship .......................................................................................................................28

WAIVER OF FED. R. BANKR. P. 4001(a)(3) ...........................................................................31

CONCLUSION ............................................................................................................................32

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                    <u>**PAGE(s)**</u>

In re 234-6 W. 22nd St. Corp.,
    214 B.R. 751 (Bankr. S.D.N.Y. 1997).........................................................22, 28

B.N. Realty Associates v. Lichtenstein,
    238 B.R. 249 (S.D.N.Y. 1999)...............................................................17

Baker v. Latham Sparrowbush Associates
(In re Cohoes Industrial Terminal, Inc.),
    931 F.2d 222 (2d Cir. 1991)..................................................................24

In re Baxter & Baxter,
    172 B.R. 198 (Bankr. S.D.N.Y. 1994)...................................................10

Bridge to Life, Inc. v. Lucadamo
(In re Bridge to Life, Inc.),
    CV-05-5499 (CPS), 2006 U.S. Dist. LEXIS 29652 (E..D.N.Y. May 16, 2006) ...............30

C-TC 9th Avenue P'Ship v. Norton Co.
(In re C-TC 9th Avenue P'Ship),
    113 F.3d 1304 (2d Cir. 1997)..................................................22, 23, 24, 28, 29

In re Eclair Bakery, Ltd.,
    255 B.R. 121 (Bankr. S.D.N.Y. 2000)...................................................22, 28

In re Elmira Litho, Inc.,
    174 B.R. 892 (Bankr. S.D.N.Y. 1994)...................................................18

Equitable Life Assurance Society v. James River Associates
(In re James River Associates),
    148 B.R. 790 (E.D. Va. 1992).................................................................19

In re Fennell,
    495 B.R. 232 (Bankr. E.D.N.Y. 2012).....................................................20

In re Fortune Smooth (U.S.) Ltd.,
Case No. 93 B 40907 (JLG), 1993 Bankr. LEXIS 2377
 (Bankr. S.D.N.Y. July 6, 1993)................................................................19

In re Henry,
    173 B.R. 878 (Bankr. D.N.J. 1993) .......................................................17

**CASES**                                                                                          **PAGE(s)**

In re Highway 751 Partners, LLC,
        Case No. 09-06564-8-JRL, 2010 Bankr. LEXIS 562
        (Bankr. E.D.N.C. Feb. 22, 2010) ...................................................................12

In re Inwood Heights Housing Development Fund Corp.,
        Case No. 11-13322 (MG), 2011 Bankr. LEXIS 3251
        (Bankr. S.D.N.Y. Aug. 25, 2011) ............................................................18, 19

In re Kaplan Breslaw Ash, LLC,
        264 B.R. 309 (Bankr. S.D.N.Y. 2001) ...............................................................29

Kost v. First Interstate Bank (In re Kost),
        102 B.R. 829 (D. Wyo. 1989) ...........................................................................19

NationsBank, N.A. v. LDN Corp. (In re LDN Corp.),
        191 B.R. 320 (Bankr. E.D. Va. 1996) ......................................................10, 14

In re Project Orange Associates, LLC,
        432 B.R. 89 (Bankr. S.D.N.Y. 2010) .................................................................21

Provident Mutual Life Insurance Co. v. Winslow Ctr. Associates
(In re Winslow Ctr. Associates),
        32 B.R. 685 (Bankr. E.D. Pa. 1983) ..................................................................20

In re RYYZ, LLC,
        490 B.R. 29 (Bankr. E.D.N.Y. 2013)..........................................................10, 11, 21

In re Schuessler,
        386 B.R. 458 (Bankr. S.D.N.Y. 2008) ...............................................................20

Sonnax Industrial, Inc. v. Tri Component Products Corp.
(In re Sonnax Industrial),
        907 F.2d 1280 (2d Cir. 1990)..............................................................17, 21, 22

In re Syndicom Corp.,
        268 B.R. 26 (Bankr. S.D.N.Y. 2001) .................................................................30

Taub v. Adams,
        Nos. 10-CV-02600 (CBA), 10-CV-02611 (CBA), 2010 U.S. Dist. LEXIS 104805
        (E.D.N.Y. Aug. 30, 2010) ..................................................................................26

**CASES**                                                             **PAGE(s)**

In re Westgate Properties,
    432 B.R. 720 (Bankr. N.D. Ohio 2010) ............................................................26

In re Willows of Coventry Ltd. Partnership,
    154 B.R. 959 (Bankr. N.D. Ind. 1993) ............................................................21

Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.),
    490 B.R. 470 (S.D.N.Y. 2013) ........................................................................19

In re WorldCom, Inc.,
    Case No. 02-13533 (AJG), 2003 Bankr. LEXIS 2440
    (Bankr. S.D.N.Y. Jan. 30, 2003) .....................................................................19

**STATUTES**                                                    **PAGE(s)**

Fed. R. Bankr. P. 4001(a)(3) ...................................................................31

11 U.S.C. § 361 .....................................................................................18

11 U.S.C. § 361(3) .................................................................................18

11 U.S.C. §§ 362 .....................................................................................2

11 U.S.C. § 362(d)(1) ..................................................................... *passim*

11 U.S.C. § 362(d)(2) ..................................................................... *passim*

11 U.S.C. § 362(d)(3) ..................................................................... *passim*

11 U.S.C. § 362(d)(3)(A) ............................................................10, 11, 14

11 U.S.C. § 362(d)(3)(B) ...............................................................10, 12

11 U.S.C. § 362(d)(3)(B)(ii) .................................................................10

11 U.S.C. § 362(g) .................................................................................17

11 U.S.C. § 363 .......................................................................................3

11 U.S.C. § 543(d)(1) ..............................................................................3

11 U.S.C. § 1112 .....................................................................................2

11 U.S.C. § 1112(b) .......................................................................26, 28, 31

11 U.S.C. § 1112(b)(4) ..........................................................................26

11 U.S.C. § 1112(b)(4)(A) .................................................................26, 27

11 U.S.C. § 1127(a) ................................................................................11

11 U.S.C. § 1129 ..............................................................................10, 11

## STATUTES                                                                    PAGE(s)

28 U.S.C. §§ 157 ..................................................................................................................2

28 U.S.C. §§ 157(b)(2)(A) ...................................................................................................2

28 U.S.C. §§ 157(b)(2)(G) ...................................................................................................2

28 U.S.C. §§ 1334 ................................................................................................................2

28 U.S.C. §§ 1408 ................................................................................................................2

28 U.S.C. §§ 1409 ................................................................................................................2

## LEGISLATIVE HISTORY

H.R. No. 95-595, 95th Cong., 1st Sess. at 405-6 (1978),
1978 U.S.C.C.A.N. at 5787, 6363-64 ................................................................................28

S. Rep. No. 103-168, 1st Sess. (1993) ...............................................................................10

71 Clinton Street Apartments LLC ("71CSA"), by and through its undersigned counsel, submits this motion (the "Motion") for entry of an Order granting relief from the automatic stay to permit it to exercise its rights and remedies (including, but not limited to, the foreclosure sale and auction of) with respect to the real property known as 71 Clinton Street, New York, New York (the "Property"), and the personal property attached to or used in connection with the Property that was the subject of a foreclosure action that 71CSA brought against the Debtor (the "Debtor", and together with 71CSA, collectively, the "Parties"), among others, in the Supreme Court of the State of New York, County of New York (the "Supreme Court").   Alternatively, 71CSA seeks entry of an order dismissing the above-captioned bankruptcy case (the "Bankruptcy Case") with prejudice.   In support of the Motion, 71CSA respectfully represents as follows:

## PRELIMINARY STATEMENT

1.      The Bankruptcy Code mandates that within the first ninety days of a bankruptcy case, a single asset real estate debtor must either begin to make monthly payments or file a plan that has a reasonable possibility of being confirmed within a reasonable time.   Choosing not to open its wallet, the Debtor instead filed a plan on day ninety of the Bankruptcy Case.

2.      The Debtor's plan does not provide for a viable exit from bankruptcy, as its success is contingent on an illusory sale of the Property.   To date, the Debtor has not secured a purchaser for the Property or held an auction for the sale of the Property, despite having filed two stalking horse purchase agreements and supposedly entered into negotiations with at least seven proposed stalking horse purchasers.   The plan has no likelihood of being confirmed within a reasonable time and, as a result, 71CSA is entitled to stay relief pursuant to 11 U.S.C. § 362(d)(3).

3.    71CSA also moves for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(1) given that during the Bankruptcy Case, the Debtor has not made any payments to 71CSA or provided adequate protection of 71CSA's interests.

4.    Alternatively, this Court should dismiss the Bankruptcy Case with prejudice. This case is a two party dispute between the Parties that already has been adjudicated to conclusion in the Supreme Court. All that remains is the sale of the Property. The filing of the Bankruptcy Case on the day before the foreclosure sale has all the indices of a bad faith filing, as it was commenced to frustrate 71CSA's rights as to its collateral. Furthermore, the Debtor's postpetition conduct, fraught with delays and excuses, only buttresses the inevitable conclusion that the Bankruptcy Case is the byproduct of the Debtor's bad faith.

5.    While the Debtor's gaming of the bankruptcy process has allowed it to buy six months in bankruptcy, this Court should not condone this type of "kick the can" mentality while 71CSA, and the Debtor's other creditors, hang in the balance. Accordingly, should this Court not grant 71CSA stay relief, it should dismiss the Bankruptcy Case for cause and with prejudice.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.    This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (G).

8.    The request for relief made herein is brought pursuant to 11 U.S.C. §§ 362 and 1112.

## BACKGROUND

### (i)    The Receiver Motion

9.      71CSA hereby refers to and incorporates by reference the background section[1] of and all exhibits cited in its verified motion Excusing Receiver From Compliance with Turnover Requirements and Establishing Powers and Duties of Receiver Pursuant to 11 U.S.C. § 543(d)(1), filed on October 20, 2014 [Dkt. No. 8] (the "Receiver Motion").[2]

10.     In light of 71CSA's allegations and over the Debtor's objections, the Court granted the Receiver Motion, entered an Interim Order on November 14, 2014 [Dkt. No. 27] and a Final Order on December 10, 2014 [Dkt. No. 34] (the "Final Bankruptcy Receiver Order").

### (ii)    The Disclosure Statement, Plan And Initial Purchase Agreement

11.     On January 5, 2015, ninety days after the Petition Date, the Debtor filed its chapter 11 plan (the "Plan") and disclosure statement (the "Disclosure Statement").  Dkt. Nos. 41 & 42.

12.     Three months since its filing, the Debtor still has not scheduled a hearing to approve the adequacy of the Disclosure Statement.

13.     The Plan contemplates a § 363 sale of the Property, with the proceeds used to pay the Debtor's creditors.  Along with the Disclosure Statement, the Debtor submitted a stalking horse purchase agreement (the "LES PA") with an entity called "LES 71 Clinton LLC" ("LES 71").  Pursuant to the LES PA, LES 71 would purchase the Property for $14.5 million.

14.     However, as outlined below, the LES PA lacks many of the attributes of a true

---

[1] For the avoidance of doubt, without reiterating verbatim in the instant Motion, 71CSA incorporates the following subsections from the Receiver Motion: (I) The Foreclosure Action, (II) The Chapter 11 Case and (III) The Ilana Industrial LLC Bankruptcy Case.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Receiver Motion.

stalking horse purchase agreement.  First, the LES PA does not create a *binding* obligation on LES 71 to purchase the Property as it provides LES 71 with an unconditional right to cancel the LES PA for any reason, without consequence, until February 12, 2015.  See LES PA at § 2.5(b). Thus, the LES PA is a free purchase option which grants LES 71 an out from under the agreement without consequence.

15.    Second, the LES PA permits LES 71 as much as sixty days after execution to continue diligence of the Property, with a unilateral right to cancel during that period.  See id. at § 17.1.  The LES PA also allows LES 71 to defer payment of one half of the deposit until after expiration of the diligence period.  See id., Schedule C.  Third, the LES PA does not contain any of the buyer protections typically found in stalking horse purchase agreements, such as a "break-up fee."  See generally LES PA.

16.    Fourth, the Debtor provided no information or disclosure on LES 71, including any information regarding its ownership and/or relationship with the Debtor or Rosenfeld. Moreover, the Debtor did not provide any information regarding whether LES 71 actually has the financial wherewithal to fund the Property's $14.5 million purchase price.

17.    Fifth, the Debtor did not file any pleadings that seek an appropriate order establishing procedures regarding the sale of the Property.  While the Debtor eventually filed a motion seeking entry of an order approving sale procedures, it only did so after the Court, in response to 71CSA's letter concerning the Debtor's persistent delays in moving this case forward [Dkt. No. 50], compelled the Debtor to take action by its Memorandum Endorsed Order of February 18, 2015 [Dkt. No. 51] (the "Memo Order").

18.    Notwithstanding the proposed sale of the Property to LES 71 contemplated by the Plan, all of the relevant dates contained in the LES PA have since expired.

(iii)     **The Sale Procedures Motion**

19.     In accordance with the Memo Order, the Debtor had until 5:00 p.m. on February 24, 2015 to file a bid procedures motion or be required to appear telephonically at a conference with the Court.  See generally Memo Order.  Minutes before the deadline, the Debtor filed its sale procedures motion [Dkt. No. 52] (the "Sale Procedures Motion").

20.     The Sale Procedures Motion includes a proposed Sale Procedures Order, proposed Bidding Procedures, proposed Notice of Auction and a signed stalking horse agreement (the "Stalking Horse Agreement") with Espanda Group, LLC ("Espanda").  See Sale Procedures Motion, Exhs. A, A(a), A(b) & A(c) (collectively, the "Sale Procedures Papers").

21.     The Debtor unilaterally and successfully requested several continuances of the hearing on the Sale Procedures Motion.  See Dkt. Nos. 58, 63.

22.     Meanwhile, on March 6, 2015, 71CSA's counsel sent Debtor's counsel blacklines of the Sale Procedures Papers to reflect issues related to the consummation of the sale of the Property.  Those issues included, first, the Stalking Horse Agreement allowed Espanda up to sixty days of diligence, with a unilateral right to terminate the Stalking Horse Agreement during that time (like the LES PA).  See Stalking Horse Agreement at § 17.1.  Second, Espanda was permitted to withhold paying half of the deposit until completion of its diligence.  See id. at Schedule "C."

23.     Third, while the Stalking Horse Agreement provided Espanda with certain bid protections, including a $150,000 break-up fee, 71CSA did not support the stalking horse bidder's entitlement to a break-up fee while retaining a unilateral right to cancel the contract for any reason.

24.    Fourth, the Stalking Horse Agreement also prohibited the Debtor from entering into any new leases at the Property while the sale is pending.  See id. at § 6.2.  Yet just eleven days prior to filing the Sale Procedures Motion, the Debtor had filed a motion [Dkt. No. 49] (the "Rivington Motion") to enter into a commercial lease with Rivington Clinton LLC ("Rivington"). Thus, the Stalking Horse Agreement was at odds with the Rivington Motion.

25.    On March 9, 2015, 71CSA filed a limited objection to the Sale Procedures Motion to preserve its rights with respect to the issues it raised informally regarding the Sale Procedures Papers.  Dkt. No. 56.

26.    With the Debtor having failed to respond to 71CSA's blacklines, by letter dated March 16, 2015, 71CSA's counsel advised the Court of the unresolved issues with the Sale Procedures Papers.  See Dkt No. 60.  On that same day, the Debtor requested a continuance of the Sale Procedures Motion hearing to March 26, 2015, because of "multiple requests by various parties for significant changes and modifications to the proposed pleadings."  Dkt. No. 61.[3] Ultimately, the Court continued the Sale Procedures Motion hearing to March 26, 2015, and conducted a status conference on March 19, 2015.

27.    During the March 19, 2015 status conference, the Court noted that the Debtor's efforts thus far were insufficient, characterizing the Debtor's promises to complete the sales process as "empty."  See 3/19/15 Tr. at 12:16-24.[4]  The Court directed the Parties' counsel to meet on March 20, 2015.  See id. at 14:23–16:25.

28.    At the conclusion of the March 20, 2015 meeting to review 71CSA's blacklines to the Sale Procedures Papers, Debtor's counsel represented that he would provide revised

---

[3] Incredibly, the Debtor also contended that it was occupied with discovery in connection with the Rivington Motion even though, as described herein, it never complied with its discovery obligations.

[4] A true and correct copy of the March 19, 2015 transcript is annexed hereto as **Exhibit "A**."

documents by March 24, 2015.  Finally, on March 25, 2015, Debtor's counsel circulated revised Sale Procedures Papers, including a revised, though unsigned, Stalking Horse Agreement.

29.     At the March 26, 2015 hearing, the Court learned that while the Debtor had made certain of the changes to the Sale Procedures Papers, the Debtor still had not remedied certain of the problems with the Stalking Horse Agreement.   See 3/26/2015 Tr.4:1–19.[5]  The Stalking Horse Agreement was not executed and there was no indication that Espanda accepted the Debtor's changes.   Furthermore, the Stalking Horse Agreement still contained provisions allowing Espanda to continue due diligence, with a unilateral right to cancel during the diligence period.   Thus, the revised Stalking Horse Agreement provided Espanda with an out from the agreement.

30.     During the March 26, 2015 hearing, the Court observed that the Debtor still did not have a true stalking horse purchase agreement.   See Tr. 3/26/2015 6:1-7:1.   The Debtor reported that it was now negotiating with yet another new potential bidder, id. at 7:2-13, and the Court gave the Debtor until April 6, 2015 to submit a *binding* stalking horse purchase agreement. Id. at 10:16-11:22.

31.     On April 3, 2015, the Debtor filed a letter with the Court requesting an extension of the April 6, 2015 deadline to April 14, 2015.  Dkt No. 75.  In that letter, the Debtor referred to at least three *new* parties that expressed an interest in serving as a stalking horse purchaser, now totaling seven stalking horse bidders since the Petition Date.   Id.

32.     The Court extended the Debtor's time to file a bid procedures motion through April 14, 2015, with the explicit directive that it will not grant any further extensions.[6]

---

[5] A true and correct copy of the March 26, 2015 transcript is annexed hereto as **Exhibit "B**."

[6] A true and correct copy of an April 3, 2015 email from the Court granting the Debtor's extension request is annexed hereto as **Exhibit "C**."

33.     As of the date of this Motion, the Debtor has not submitted a *binding* stalking horse agreement.

**(iv)     The Debtor's Failure To Comply With 71CSA's Discovery Requests**

34.     In the Rivington Motion, the Debtor failed to include any evidentiary support or information that would allow the Court to ascertain whether entering into the new commercial lease was an exercise of its sound business judgment.

35.     As a result, 71CSA undertook limited discovery on this specific issue from (1) the Debtor; (2) Rivington and (3) Massey Knakal.[7]

36.     While Rivington and Massey Knakal complied with their discovery obligations, the Debtor failed to cooperate.  It did not respond to the Request for Production of Documents and, despite agreeing to sit for a deposition, the Debtor failed to appear for an April 12, 2015 deposition.  To date, the Debtor has not offered an explanation for its failure to produce documents or appear for its deposition.

**(v)     Current Status Of The Property And Indebtedness To 71CSA**

37.     In accordance with the Final Bankruptcy Receiver Order, the Receiver and his managing agent continue to serve in their respective roles in connection with the apartment building located at the Property.

38.     Currently, all but one residential unit is occupied.  One of the two commercial units is occupied and paying rent.  The second commercial unit is the subject of the lease with Rivington.  At its current level of occupancy, the Property is generating approximately $54,000 per month.  Monthly expenses run approximately $25,000 per month, resulting in net income of approximately $29,000 per month.  See Feb. 2015 Receiver Monthly Management Report, a true

---

[7] True and correct copies of 71CSA's Notice of Deposition and Request for Production of Documents issued to the Debtor are annexed hereto as **Exhibit "D."**

and correct copy of which is annexed hereto as **Exhibit "E**."[8]  Once Rivington commences

paying under its lease, rental income will increase by $12,500 per month for the first year of the

Rivington Lease.[9]

39.     The Receiver is currently holding $529,220 in cash, which is comprised of

$46,426 in tenant security deposits and $482,794 in operating cash.  See Exh. E at pp. 2-4.

40.     As of the Petition Date, the Debtor was indebted to 71CSA in an amount of

$12,907,850.97, which includes (a) the amount of 71CSA's Foreclosure Judgment

($12,634,282.74); (b) statutory post-judgment interest (9%) up to the Petition Date ($87,228.47);

(c) certain costs associated with the foreclosure sale ($5,397.20) and (d) an unliquidated amount

of prepetition attorney fees.[10]  To the extent that the value of the Property exceeds the amount of

71CSA's prepetition claim, 71CSA's total claim has increased since the Petition Date with

additional interest, attorneys' fees and costs, all as provided for under the Consolidated

Obligations and pursuant to section 506(b) of the Bankruptcy Code.  As of the date hereof,

71CSA estimates that its total prepetition and postpetition claim amount is no less than

$13,704,900.

## RELIEF REQUESTED

**A.      71CSA IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY
PURSUANT TO 11 U.S.C. § 362(d)(3)**

**(i)      The Standard Under 11 U.S.C. § 362(d)(3)**

41.     Section 362(d)(3) compels debtors, within ninety days postpetition, to either (A)

"[file] a plan of reorganization that has a reasonable possibility of being confirmed within a

---

[8] See also Dkt. No. 70 (Debtor's Feb. 2015 Monthly Operating Report).

[9] Pursuant to the terms of the Rivington Lease, Rivington is not obligated to pay rent until the fourth month of the lease.  See Rivington Lease, Rider to Lease, § 80.

[10] See Claim No. 5-1 (71CSA proof of claim).

reasonable time[,]" 11 U.S.C. § 362(d)(3)(A), or, failing this, (B) make monthly payments "in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate[.]"  11 U.S.C. § 362(d)(3)(B)(ii).

42.    In enacting section 362(d)(3) "Congress expressly attempted to avoid the usual delays experienced in Chapter 11 in single asset real estate cases, which historically have been filed to avoid a foreclosure and in the hope that the debtor can come up with some form of a miracle in order to formulate an acceptable plan." NationsBank, N.A. v. LDN Corp. (In re LDN Corp.), 191 B.R. 320, 326 (Bankr. E.D. Va. 1996); see also RYYZ, LLC, 490 B.R. 29, 34 (Bankr. E.D.N.Y. 2013) ("With insufficient cash flow[s], an inability to obtain alternative financing, few creditors besides the lender, and quite often binding judgments of foreclosure, an attempt to satisfy the confirmation requirements of 11 U.S.C. § 1129 is often a fool's errand"); In re Baxter & Baxter, 172 B.R. 198, 201 (Bankr. S.D.N.Y. 1994) (stating that the Second Circuit "clearly looks upon the confirmation of a single-asset real estate case over the lender's objection as aberrational").

43.    Section 362(d)(3) is designed to protect secured creditors by requiring debtors to act quickly, either by filing a confirmable plan within a prescribed timeframe or by compensating the creditor with statutory payments.  See, e.g., LDN, 191 B.R. at 327 (stating that section 362(d)(3) "was enacted to assist secured creditors in single asset real estate cases") (citation omitted).  At the same time, section 362(d)(3) provides a 90-day window of opportunity for single asset real estate debtors to either file a confirmable plan or beginning paying their secured lender.  Thus, section 362(d)(3) protects secured creditors by "'ensur[ing] that the automatic stay provision is not abused,'" and helps debtors by affording them an "'opportunity to

create a workable plan of reorganization.'"  Id. at 326 (quoting S. Rep. No. 103-168, 1st Sess. (1993)).

44.    On a motion under section 362(d)(3), a creditor bears the initial burden of demonstrating the quantum of its claim and its security interest in the real property.  See RYYZ, LLC, 490 B.R. at 37.  A debtor must establish that a reorganization based on its plan is in prospect.  See id.  (noting that "[i]f the value of the property is dispositive of whether the plan has a reasonable possibility of being confirmed within a reasonable period of time, then the debtor bears the ultimate burden of persuasion with regard to value.").

45.    The Bankruptcy Court for the Eastern District of New York recently explained the standard for which a plan should be evaluated for section 362(d)(3) purposes:

> As the foregoing implies, the debtor's plan will be measured against 11 U.S.C. § 1129's confirmation requirements.  However, the debtor's burden is less onerous under Section 362(d)(3)(A) than it is at confirmation; a debtor need not prove that its plan *shall be* confirmed.  A mini-confirmation hearing is not required, nor is it appropriate, absent good reason to continue to restrain the lender from exercising its rights.  While the debtor's plan does not have to be perfect, the plan, together with the evidence and the debtor's arguments, must delineate a credible path to reorganization.  Hurdles to plan confirmation must be addressed in a way that provides the court with grounds to conclude (i) it is more likely than not they will be overcome, and (ii), because there is a time element, they can be overcome promptly.  Unless the plan has a true prospect of being confirmed within a reasonable time, or timely payments have been made, a secured creditor should not be compelled to endure further delay, expense, and risk.

Id. (emphasis in original).

**(ii)    There Is No Reasonable Possibility Of The Plan Being Confirmed Within A Reasonable Time**

46.    Here, the Debtor has made no postpetition payments to 71CSA.  Instead, ninety days after the Petition Date, the Debtor filed its Plan and Disclosure Statement.  Dkt. Nos. 41 & 42.  The Plan, in its current form, is subject to this Court's § 362(d)(3) analysis and may not be amended for the purpose of this analysis.  RYYZ, LLC, 490 B.R. at 38 n.9 ("[t]o be sure, a

debtor may not file a token plan within the 90-day period and then defend a lift stay motion by arguing that its late-filed amended plan can be confirmed.  While 11 U.S.C. § 1127(a) allows a debtor to file an amended plan, this general provision cannot be used as an end-run around the more specific language in Section 362(d)(3)");  In re Highway 751 Partners, LLC, Case No. 09-06564-8-JRL, 2010 Bankr. LEXIS 562, at *4 (Bankr. E.D.N.C. Feb. 22, 2010) ("Even if the debtor's amended plan were confirmable, it was not filed within 90 days of the order for relief" and therefore, movant is entitled to stay relief under 362(d)(3)).

47.    In this instance, there is no possibility that the Plan can be confirmed within a reasonable time.  This is evident by the fact that, inter alia, more than three months have elapsed since the Debtor filed its Disclosure Statement and it still has not asked this Court for its approval.  The reason for this delay is evident - the Plan is patently unconfirmable and the Disclosure Statement cannot be approved for solicitation to creditors.

48.    The Debtor filed the Plan as a placeholder to avoid its § 362(d)(3)(B) payment obligations.  However, given that the Plan has no reasonable possibility of being confirmed within a reasonable time, the Debtor has proceeded in a manner contrary to § 362(d)(3).  Instead of protecting 71CSA and motivating the Debtor to act quickly to propose a viable plan, the Debtor has perpetuated the delay that Congress specifically sought to avoid in enacting section 362(d)(3).  Here, the Debtor is both taking advantage of the automatic stay by denying 71CSA's right to foreclose and abusing § 362(d)(3) by filing a Plan that has no reasonable possibility of being confirmed within a reasonable time.  Granting the instant Motion will help end this abuse.

### (a)    The Plan Has No Reasonable Possibility Of Being Confirmed

49.    The Plan is predicated upon a sale of the Property, the proceeds of which would be used to pay creditors.  However, for the Plan to be confirmable, the Property must first be

sold.  In other words, if the Property has no buyer, then there will be no sale, in which case the

Plan is unconfirmable.  As of the date of this Motion, there is neither a proposed purchaser of the

Property nor a sale scheduled for the Property.

50.    Since filing the Plan, the Debtor has failed to bring any committed purchaser to

the table that is willing to serve as a *binding* stalking horse purchaser.  Notwithstanding that LES

71 and Espanda expressed an interest in purchasing the Property, neither was willing to commit

under a binding sale agreement.

51.    To date, the Debtor has negotiated with at least seven potential stalking horse

purchasers.[11]  Yet, their interest in the Property was dubious insofar as both LES 71 and Espanda

were allowed to unilaterally terminate their rights under their respective agreements without any

penalty or commitment.  Moreover, LES 71 and Espanda were permitted additional time to

perform due diligence and did not require either party to commit to a full deposit until after the

diligence period.  Thus, neither the LES PA and Stalking Horse Agreement bound any buyer to

purchase the Property.  Hence, while those purchase agreements purported to commit LES 71

and Espanda to purchase the Property, both gave their buyers several outs without penalty.

52.    After 71CSA objected to the non-binding nature of the LES PA and Stalking

Horse Agreement, both LES 71 and Espanda backed out from purchasing the Property.  No party

has expressed a willingness to serve as a committed purchaser under a *binding* stalking horse

---

[11] Those seven purchasers are identifiable through the following pleadings, hearing transcripts and correspondence. At the November 3, 2014 initial case conference, Debtor's counsel indicated that the Debtor already had fielded a potential stalking horse bid for $14.5 million.  11/3/14 Tr. at 6:11-12 (A true and correct copy of the November 3, 2014 transcript is annexed hereto as **Exhibit "F"**).  The Debtor later filed a Disclosure Statement that included a stalking horse purchase agreement with LES 71, which Debtor's counsel divulged was a different purchaser than that alluded to on November 3, 2014.  (A true and correct copy of a January 7, 2015 email from Debtor's counsel is annexed hereto as **Exhibit "G"**).  On February 24, 2015, the Debtor filed its Sale Procedures Motion, naming Espanda as the stalking horse.  Supra at ¶¶ 19-20.  At the March 26, 2015 hearing, the Debtor advised it was negotiating with yet another bidder.  3/26/15 Tr. at 7:2-12.  And on April 3, 2015, the Debtor revealed that it was negotiating with three new parties interested in serving as a stalking horse purchaser.  Dkt. No. 75.

purchase agreement.  The Court even extended the deadline for the Debtor to file such a stalking horse agreement from April 6, 2015 to April 14, 2015.  However, the Debtor conspicuously has failed to file that agreement.

53.    Without a committed purchaser and Court approved sale procedures order, there can and will be no sale of the Property.  Without a sale of the Property, the Plan has no possibility, much less a reasonable possibility, of being confirmed.  Given that, 71CSA will continue to be held hostage regarding its right to foreclose upon the Property.  That could not have been Congress' intent in enacting § 362(d)(3) of the Bankruptcy Code.  Accordingly, the Court should immediately grant 71CSA stay relief pursuant to § 363(d)(3)(A).

### (b)    The Plan Has No Reasonable Possibility Of Being Confirmed Within A Reasonable Time

54.    More than ninety days has elapsed since the Debtor filed its Plan and Disclosure Statement.  Since that time, the Debtor has not requested that the Court approve the Disclosure Statement.  Over the past six months, the Debtor has filed two "stalking horse" purchase agreements, neither of which has garnered Court approval, and alluded to at least seven proposed purchasers of the Property that have disappeared.  The Debtor is no closer to confirming a plan today than it was on the Petition Date.  Thus, it is clearer than ever that any prospect of the Plan being confirmed within a reasonable time has long since vanished.

55.    Section 362(d)(3) was designed to protect secured creditors by requiring debtors to act expeditiously by filing a confirmable plan.  LDN at 327.  This is sensible since most chapter 11 single asset real estate cases are filed to avoid a foreclosure.  Id.  But, contrary to the designs of Congress to protect secured creditors and to compel single asset real estate debtors to act quickly, the Debtor has continued with its pattern of delay, which started prior to the Petition Date, to the extreme detriment and prejudice of 71CSA.

14

56.     After filing the Plan on January 5, 2015, the Debtor undertook absolutely no actions in furtherance of the Plan or the sale of the Property until 71CSA requested, on February 17, 2015, that the Court schedule a conference regarding the status of the bid procedures.  Dkt No. 50.  Only after that request and the Court's issuance of the Memo Order did the Debtor finally file the Sale Procedures Motion.  Hence, the Debtor only filed the Sale Procedures Motion when the Court instructed it to do so or else explain itself at a status conference.

57.     That Sale Procedures Motion is a bare bones pleading that lacks sufficient information and disclosures.  71CSA detailed those deficiencies to the Debtor and later summarized them in its limited objection to the Sale Procedures Motion.  Dkt No. 56.

58.     While the Debtor indicated in the Sale Procedures Motion that it had been "working collaboratively with its creditors and is indeed working with the Secured Creditor who is generally supportive of the sale process[,]" the Debtor never involved 71CSA in any negotiations with Espanda and 71CSA did not learn of Espanda until after the filing of the Sale Procedures Motion.  Moreover, the Debtor never consulted with 71CSA regarding the Stalking Horse Agreement before its execution.  Hence, thematic of the Bankruptcy Case, the Sale Procedures Motion was not the byproduct of collaboration between the Debtor and 71CSA.

59.     Having been ordered by the Court to file the Sale Procedures Motion, the Debtor proceeded to continue the March 9, 2015 hearing on the motion on two occasions.  The Debtor delayed the hearing on the Sale Procedures Motion for more than thirty days, notwithstanding that it sought to shorten the notice period regarding the motion.  On April 3, 2015, still without a committed stalking horse purchaser, the Debtor sought and was granted a further extension of time to April 14, 2015 to file a stalking horse agreement.  More than three months after filing the Plan and nearly two months after filing the Sale Procedures Motion, the Debtor still has not

secured a committed purchaser of the Property or a Court approved sale or bid procedures order

with a date scheduled for the sale.

60.    This delay is entirely unreasonable and contrary to the designs of Congress in

enacting § 362(d)(3).  Section 362(d)(3) of the Bankruptcy Code was drafted to lead a single

asset real estate debtor swiftly in and out of the chapter 11 process so as to protect a secured

creditor with respect to its collateral.  But the exact and usual delays that Congress sought to

avoid are seemingly present throughout this Bankruptcy Case, as evidenced by the lack of

progress the Debtor has made toward selling the Property and confirming the Plan.

61.    Had the Debtor not commenced its Bankruptcy Case, 71CSA would have

foreclosed on its interests in the Property.  Instead, more than six months into the Bankruptcy

Case, the Debtor is without: (i) a proposed purchaser of the Property, (ii) any prospect of an

auction for a sale of the Property, (iii) an approved disclosure statement and (iv) a timeline for

Plan confirmation and a chapter 11 exit.  Any prospect of the Plan being confirmed within a

reasonable time has vanished.  The Debtor has succeeded in denying 71CSA its right to be paid

while delaying the chapter 11 process to the detriment and prejudice of all creditors.

62.    The Debtor should not be rewarded for its delay tactics, which are antithetical to

Congressional intent underlying section 362(d)(3) of the Bankruptcy Code.  Without a

prospective purchaser or scheduled auction of the Property, there simply can be no sale of the

Property in accordance with the Plan.  As such, the Plan has no possibility of being confirmed

within a reasonable time because that time has long passed.

63.    Accordingly, the Court should grant 71CSA relief from the automatic stay

pursuant to § 362(d)(3) so that it may pursue its state law rights with respect to the Property.

**B.    71CSA IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY FOR "CAUSE" PURSUANT TO 11 U.S.C. § 362(d)(1)**

64.    In addition to being afforded stay relief pursuant to § 362(d)(3), this Court also should grant 71CSA stay relief for "cause" pursuant to § 362(d)(1).

65.    Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay . . . (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . ." 11 U.S.C. § 362(d)(1).

66.    While one example of "cause" (a "lack of adequate protection" of an interest in property of the creditor) is specifically referenced in the statute, case law establishes that, in general, "cause" under section 362(d)(1) is determined on a case-by-case basis.  In re Henry, 173 B.R. 878, 882 (Bankr. D.N.J. 1993).  71CSA, as the moving party, must make an initial showing of cause for relief from the stay.  B.N. Realty Assocs. v. Lichtenstein, 238 B.R. 249, 258 (S.D.N.Y. 1999).  The burden then shifts to the Debtor, which has the burden of proof on all other issues with the exception of equity in the property.  See 11 U.S.C. § 362(g).

67.    "Neither the statute nor the legislative history defines the term 'for cause.'" Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus.), 907 F.2d 1280, 1285 (2d Cir. 1990).[12]  Therefore, it is for this Court to determine whether 71CSA has established sufficient cause to warrant lifting the automatic stay with respect to the Property.

---

[12] In Sonnax, the Second Circuit identified twelve factors a court should consider when deciding whether cause exists to lift the automatic stay to allow litigation to proceed in another forum.  Sonnax, 907 F.2d at 1286.  Here, the Foreclosure Action has already resulted in the Foreclosure Judgment, and all that remains is the foreclosure sale of the Property.  Accordingly, 71CSA submits that Sonnax is inapplicable to the instant Motion because it is not seeking to lift the automatic stay to proceed with litigation in another forum, but rather to consummate the foreclosure sale.  Notwithstanding the above, applying the Sonnax factors to the instant case would weigh in favor of lifting the automatic stay for 71CSA to proceed with its foreclosure on the Property.

**(i)      71CSA's Lack Of Adequate Protection In The Property Constitutes Cause For Relief To Lift The Automatic Stay**

68.      Stay relief is available to a party with an interest in estate property when the party's interest is not adequately protected.  See In re Inwood Heights Hous. Dev. Fund Corp., Case No. 11-13322 (MG), 2011 Bankr. LEXIS 3251, at *24 (Bankr. S.D.N.Y. Aug. 25, 2011) (citations omitted).  The term "adequate protection" is not defined in the Bankruptcy Code, but Section 361 "gives examples of what might constitute adequate protection and, at least in one instance, of what will not constitute adequate protection."  Id. at *24-25 (citation omitted). Specifically, adequate protection may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. § 361.

**(a)      There Is No Equity Cushion**

69.      One common way of meeting the "indubitable equivalent" standard in 11 U.S.C. § 361(3) is through the existence of an equity cushion.  An equity cushion in property "provides adequate protection if it is sufficiently large to ensure that the secured creditor will be able to recover its entire debt from the security at the completion of the case."  In re Elmira Litho, Inc.,

174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994).

70.     An equity cushion exists if the value of the collateral available to the creditor exceeds by a comfortable margin the amount of the creditor's claim.  See Inwood, 2011 Bankr. LEXIS 3251, at *26.  The amount of equity cushion sufficient to provide adequate protection is determined on a case-by-case basis.  See, e.g., Equitable Life Assurance Soc'y v. James River Assocs. (In re James River Assocs.), 148 B.R. 790, 796 (E.D. Va. 1992).  Yet, courts within this Circuit have recognized that an equity cushion of less than 11% is generally insufficient to constitute adequate protection, see In re WorldCom, Inc., Case No. 02-13533 (AJG), 2003 Bankr. LEXIS 2440, at *18 (Bankr. S.D.N.Y. Jan. 30, 2003) (citing Kost v. First Interstate Bank (In re Kost), 102 B.R. 829, 831 (D. Wyo. 1989) for the proposition), while an equity cushion of more than 20% is generally sufficient to constitute adequate protection.  See In re Fortune Smooth (U.S.) Ltd., Case No. 93 B 40907 (JLG), 1993 Bankr. LEXIS 2377, at *19 (Bankr. S.D.N.Y. July 6, 1993) ("It is generally agreed that an equity cushion of twenty percent (20%) or more constitutes adequate protection, and an equity cushion of less than eleven percent (11%) is not sufficient with courts splitting as to whether an equity cushion between those two figures constitutes adequate protection."), cited with approval by Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.), 490 B.R. 470 (S.D.N.Y. 2013).

71.     Here, as evidenced by the Debtor's own estimate, there is an insufficient equity cushion in the Property above and beyond what it admittedly due to 71CSA.

72.     Specifically, while the Debtor has unsuccessfully tried to locate a committed purchaser for the Property, the Debtor has indicated that parties have expressed interest in purchasing the Property for $14.5 million.  See, e.g., 3/26/15 Tr. at 7:2-12.

73.    Yet, as of the date hereof, 71CSA estimates that its total prepetition and postpetition claim amount is no less than $13,704,900.00.  Supra ¶ 40.

74.    As such, by the Debtor's own valuation, there is no more than a 5.8% equity cushion, which is not sufficient to constitute adequate protection.

### (b)    The Value Of The Property Is Declining

75.    A secured creditor lacks adequate protection if the value of its collateral is declining as a result of the stay.  A creditor can establish its *prima facie* case by demonstrating that a debtor has failed, either completely or substantially, to make postpetition mortgage and/or real estate tax payments as they become due.  See, e.g., In re Fennell, 495 B.R. 232, 239 (Bankr. E.D.N.Y. 2012) (failure to remain current under the terms of the note and mortgage and to maintain property taxes on the property constitute "cause" to lift the stay under § 362(d)(1)); In re Schuessler, 386 B.R. 458, 480 (Bankr. S.D.N.Y. 2008) ("To be sure, the failure to make mortgage payments constitutes 'cause' for relief from the automatic stay and is one of the best examples of a 'lack of adequate protection' under Section 362(d)(1) of the Bankruptcy Code.") (citation omitted); Provident Mutual Life Ins. Co. v. Winslow Ctr. Assocs. (In re Winslow Ctr. Assocs.), 32 B.R. 685, 687 (Bankr. E.D. Pa. 1983) (failure to make monthly mortgage and tax payments constitutes cause to lift the stay).

76.    In this case, 71CSA is not adequately protected.[13]  To the contrary, the Debtor has not met any of its basic postpetition obligations, let alone attempted to provide adequate protection to 71CSA on account of its secured claim.  The Debtor has failed to make any

---

[13] While the Debtor has made representations to the Court that the Property could be sold for as much as $14,500,000, no party was willing to serve as a stalking horse purchaser for that amount.  Thus, to the extent the Property is sold in the Bankruptcy Case for an amount in excess of 71CSA's claim or this Court makes a finding that there is equity in the Property, 71CSA fully reserves its right to be treated as an oversecured creditor pursuant to § 506(b) of the Bankruptcy Code and to seek postpetition default interest, attorney's fees, costs, expenses and such other charges as permitted under the Consolidated Obligations.

postpetition payment, much less any payment under the Consolidated Obligations, to 71CSA, or

otherwise provide any form of adequate protection.  In fact, the Debtor has not made a single

payment to 71CSA since the payment due under the Consolidated Note for the month of May

2010.  As such, 71CSA has not received an actual payment from the Debtor <u>in over five years</u>.

77.    Given that the Debtor has failed to make any adequate protection payments to

71CSA since the Petition Date, and that the Debtor has not demonstrated an actual ability to

make such payments, 71CSA respectfully submits that, on these bases alone, it has demonstrated

cause under 11 U.S.C. § 362(d)(1) and should be granted stay relief.

78.    Accordingly, 71CSA's interest in the Property is not adequately protected and it

should be afforded stay relief for cause under 11 U.S.C. § 362(d)(1).

**(ii)    The <u>CTC 9th Ave. P'ship</u> Factors Continue To Weigh In Favor Of Lifting
The Automatic Stay**

79.    In addition to the lack of adequate protection, bad faith also may be sufficient

"cause" to lift the automatic stay.  <u>See</u> <u>Sonnax</u>, 907 F.2d at 1286.[14]

80.    "[T]he standards for bad faith as evidence of cause, whether in the context of

dismissal or relief from the stay, are not substantively different from each other."  <u>In re Project</u>

<u>Orange Assocs., LLC</u>, 432 B.R. 89, 112-13 (Bankr. S.D.N.Y. 2010) (internal citations and

quotations omitted).

81.    In determining whether there is bad faith sufficient to dismiss or lift the stay, the

court must analyze "whether the [d]ebtor and its principal have played by the rules; have met

---

[14] 71CSA is mindful that "Section 362(d)(3)'s specific, albeit nonexclusive, criteria for stay relief ought to counsel against knee-jerk motions at the outset of the case that merely parrot the elements of 'bad faith,' or other grounds for relief, just because the case involves single asset real estate."  <u>In re RYYZ, LLC</u>, 490 B.R. at 35 (citation omitted); <u>see</u> <u>In re Willows of Coventry Ltd. P'ship</u>, 154 B.R. 959, 967 (Bankr. N.D. Ind. 1993) (applying a "mechanical approach" to the bad faith factors "would automatically doom almost every single asset case, *ab initio*").  However, given that the Bankruptcy Case now is more than six months old, this Court should freely apply the bad faith factors as set forth in this Motion.

21

their obligations under the Bankruptcy Code; and have 'done equity' when invoking the equitable protections the Bankruptcy Code provides." In re Eclair Bakery, Ltd., 255 B.R. 121, 137 (Bankr. S.D.N.Y. 2000).

82.    While the filing of a bankruptcy petition on the "eve of foreclosure or eviction" is not sufficient alone to constitute bad faith "cause" to lift the automatic stay, it is one of many circumstances which should be considered in a totality of the circumstances analysis. Id. (citing In re 234-6 W. 22nd St. Corp., 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997)).

83.    Thus, while "a bankruptcy filing intended in part to gain relief from a state-court action does not necessarily constitute bad faith," but where the debtor has a single asset, or no going concern, "the bankruptcy filing may have as its only purpose a hope to relitigate a state court action." Sonnax, 907 F.2d at 1287 (citation omitted).

84.    The Second Circuit has identified eight factors weighing in favor of granting stay relief (or dismissing a case) for bad faith:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
> (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
> (8) the debtor has no employees.

C-TC 9th Ave. P'Ship v. Norton Co. (In re C-TC 9th Ave. P'Ship), 113 F.3d 1304, 1311 (2d Cir. 1997) (citations omitted).

85.     With respect to the Second Circuit's eight "bad faith" factors:

(1) the Debtor has one asset, the Property;
(2) the Debtor has few unsecured creditors, whose claims are small in relation to the secured creditors' claims, <u>compare</u> Schedules E (no claims listed), F (listing two (2) creditors with unknown claims) and claims register (listing four (4) unsecured creditors with claims totaling $32,942.60), <u>with</u> Schedule D (71CSA's secured claim of no less than $12,634,282.74 <u>and</u> Park Ave.'s secured claim in the amount of $700,000);
(3) the Property is the subject of the Foreclosure Action as a result of arrearages on the debt owed to 71CSA;
(4) the Debtor's financial condition is, in essence, a two-party dispute between the Debtor and 71CSA, which has been addressed in the Foreclosure Action;
(5) the Debtor has demonstrated an intent to delay by filing for bankruptcy on the day of the foreclosure sale, after years of litigation in the Supreme Court, which indicates an intent to delay and frustrate 71CSA's legitimate efforts to enforce its rights;
(6) the Debtor's net cash flow for the most recent reported month was $9,190.88 pursuant to the February 2015 monthly operating report, which does not account for any payment to 71CSA of any portion of the $12,634,282.72 liability adjudicated by the Supreme Court to be due and owing to 71CSA from the Debtor pursuant to the Foreclosure Judgment, <u>see, e.g.</u>, Dkt. No. 70; <u>see also</u> Foreclosure Judgment;
(7) the Debtor is not paying any adequate protection payments to 71CSA , <u>supra</u> ¶ 76; and
(8) upon information and belief, the Debtor has, at most, one employee, the Debtor's building superintendent who takes care of the Property.

86.     Based on the application of the <u>CTC 9th Ave. P'ship</u> factors, the Debtor's bankruptcy filing is indicative of bad faith.

87.     In addition, upon information and belief, the Debtor had granted a second mortgage on the Property to Park Ave. Funding, a violation of the provisions of the Consolidated Obligations, without ever informing 71CSA or seeking 71CSA's consent.[15]

88.     The Debtor also explicitly breached the terms of the Consolidated Mortgage by entering into "sweetheart" lease deals, whereby the Debtor leased fifteen (15) units directly to Rosenfeld for $800 per month.  <u>See</u> Receiver Motion ¶ 38.  Rosenfeld subleased out those apartments for as much as $3,200 per month.  <u>Id.</u>  The "sweetheart" leases, all dated May 1,

---

[15] While Park Ave. Funding is listed on Schedule D as having a secured claim in the amount of $700,000.00, the Debtor has never accounted to 71CSA or the Receiver as having received any funds from Park Ave. or explained how such funds were used by the Debtor.  Dkt. No. 20.

2009, had a thirteen (13) year term expiring April 30, 2022.  Id.  Through these leases, Rosenfeld diverted significant rental income away from 71CSA.  Id.  The Consolidated Mortgage specifically prohibited the Debtor from leasing all or substantially all of the Property to a single tenant without 71CSA's permission which is exactly what the Debtor did.  Id.

89.    As further evidence of the Debtor's bad faith, the Debtor disregarded the Order entered by the State Court appointing the Receiver (the "Receiver Order") by, *inter alia*, continuing to collect rental payments after the Receiver was appointed and failing to turn over or account to the Receiver for those funds.  See id. at ¶ 39.  In contravention of the Receiver Order, the Debtor also continued entering into lease agreements for apartments and forcibly broke into apartments that the Receiver had secured with new locks.  Id. at ¶ 40.

90.    Under Second Circuit precedent, the critical consideration for bad faith is whether "'it is clear that on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy . . . .'" C-TC 9th Ave. P'ship, 113 F.3d at 1309 (quoting Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.), 931 F.2d 222, 227 (2d Cir. 1991)).

91.    Here, given the lack of progress that this Debtor has made since the Petition Date, it is apparent that there never has been any reasonable likelihood that the Debtor intended to reorganize or any reasonable probability that it would emerge from bankruptcy.  See Cohoes Indus., 931 F.2d at 227.  All of the Debtor's actions since the Petition Date were taken in furtherance of its scheme to hinder and delay the foreclosure and prevent 71CSA from being paid.  This delay commenced before the Petition Date and continued through the present day.

92.    Finally, the Debtor's postpetition conduct should lead this Court to conclude that it has operated in bad faith.  This bad faith began when the Debtor falsely stated in its bankruptcy

petition that its debts were in the range of $1,000,001 to $10,000,000.  See Dkt. No. 1.  However, the Debtor was aware at the time that the Foreclosure Judgment alone was $12,634,282.74, which exceeded that range by more than $2.6 million.  See Foreclosure Judgment.  The Debtor's misrepresentation of the amount of its debts is indicative of its postpetition bad faith.

93.    Another example of the Debtor's postpetition bad faith is its continued refusal to provide any disclosure to 71CSA about the Debtor's stalking horse candidates.   During the March 26, 2015 hearing, the Court required the Debtor to provide 71CSA with information about the stalking horse bidders.  3/26/15 Tr. at 10:2–11:22.  Even though counsel for 71CSA sent emails, dated March 30, 2015 and April 6, 2015,[16] asking for that information, as of the date hereof, the Debtor has not provided 71CSA with any information.

94.    The Debtor's postpetition bad faith also extends to its refusal to comply with 71CSA's discovery requests in connection with the Rivington Motion.   71CSA pursued that discovery only because the Debtor did not include the requisite information in the Rivington Motion.  Yet, the Debtor's noncompliance with discovery did not prevent it from using that same discovery as an excuse for requesting a continuance of the March 18, 2015 Sale Procedures Motion hearing.

95.    These examples, among others, evidence the Debtor's continued postpetition bad faith during the Bankruptcy Case.  Accordingly, this Court should grant 71CSA relief from the automatic stay for cause to consummate the foreclosure sale of the Property.

---

[16] Copies of those March 30 and April 6, 2015 emails are annexed hereto as **Exhibit** "H."

## C.   IN THE ALTERNATIVE, THIS COURT SHOULD DISMISS THE BANKRUPTCY CASE WITH PREJUDICE

96.     Assuming, *arguendo,* that the Court does not grant 71CSA stay relief, then this Court should dismiss the Bankruptcy Case on the ground that it constitutes a bad faith filing under the controlling jurisprudence.

### (i)   Dismissal Is Warranted Pursuant To 11 U.S.C. § 1112(b)(4)

97.     Section 1112(b) of the Bankruptcy Code authorizes dismissal of a case, and includes sixteen examples of what may constitute cause for the Bankruptcy Court's dismissal of a bankruptcy case.

98.     The first example of cause listed in section 1112(b)(4) states that cause exists for dismissal when there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(4); In re Westgate Props., 432 B.R. 720, 723 (Bankr. N.D. Ohio 2010) (dismissing case where it appeared unlikely that debtor could effectuate a plan of reorganization and debtor had failed to supply information requested by the U.S. Trustee).  A court relying on the language of § 1112(b)(4)(A) must first determine whether the estate is suffering "substantial or continuing loss[es] . . . or diminution,' before also deciding whether there is a 'reasonable likelihood of rehabilitation.'"  Taub v. Adams, Nos. 10-CV-02600 (CBA), 10-CV-02611 (CBA), 2010 U.S. Dist. LEXIS 104805, at *36-37 (E.D.N.Y. Aug. 30, 2010).  "A debtor's negative post-petition cash flow and inability to pay current expenses establishes that the estate is suffering continuing losses."  Id. at *37 (citation and quotation omitted).

99.     Here, the Debtor has not made any postpetition mortgage or adequate protection payments.  Further, it has not shown that it has any likelihood of rehabilitation; in fact, rather than seeking rehabilitation, it is instead seeking a sale of its only asset pursuant to the Plan.  See

supra ¶¶ 11-13.  Given that the Debtor has not secured a purchaser for the Property after multiple attempts or even scheduled an auction of the Property in more than three months since filing the Plan, it is apparent that there is no likelihood of any rehabilitation.

100.    Thus, it is beyond cavil that the estate is suffering substantial or continuing losses or diminution and the Debtor cannot show that there is a "reasonable likelihood of rehabilitation" pursuant to 11 U.S.C. § 1112(b)(4)(A).  Although the Debtor has hoped for a "white knight," one has not materialized within the Bankruptcy Code's timeframes.  Therefore, the Bankruptcy Case should be dismissed so that 71CSA may proceed with a foreclosure sale of the Property in accordance with the Foreclosure Judgment.

**(ii)    The Debtor Flouted Its Discovery Obligations**

101.    71CSA's discovery in connection with the Rivington Motion was narrowly tailored and did not impose an unwarranted or undue burden on any party.  In fact, the Debtor did not object to 71CSA's discovery requests.  Yet, the Debtor failed to produce documents in response to 71CSA's document requests, and did not appear for a deposition at the agreed upon time and location.

102.    That discovery was necessitated by the Debtor's own failure to provide any information to allow 71CSA to assess whether entering into the Rivington Lease was an exercise of the Debtor's sound business judgment.  Having failed to provide 71CSA with any documents or appear for its deposition, the Debtor nonetheless used the "distraction" of that discovery as a basis to seek an adjournment of the March 18 Sale Procedures Motion hearing.

103.    The Debtor's disregard for its discovery obligations, coupled with its audacious use of 71CSA's discovery requests as an excuse for an adjournment, are themselves evidence of the Debtor's postpetition bad faith.

(iii)    **The Bankruptcy Case Should Be Dismissed Pursuant To <u>C-TC 9th Ave.
P'ship</u>**

104.    A bankruptcy court may dismiss a bad faith filing on an interested party's motion

or *sua sponte*.  See <u>9th Ave. P'ship</u>, 113 F. 3d at 1310.[17]

105.    The sixteen enumerated examples listed under § 1112(b) are illustrative, not

exhaustive, examples of what may constitute cause for dismissal of a bankruptcy case.  See H.R.

No. 95-595, 95th Cong., 1st Sess. at 405-6 (1978), <u>reprinted</u> <u>in</u> U.S.C.C.A.N. 1978, pp. 5787,

6363-64 ("[T]he list [contained in § 1112(b)] is not exhaustive.  The Court will be able to

consider other factors as they arise, and to use its equitable powers to reach an appropriate result

in individual cases.").

106.    The Second Circuit in <u>C-TC 9th Ave. P'ship</u> identified eight factors weighing in

favor of dismissing a case for bad faith:

> (1) the debtor has only one asset;
> (2) the debtor has few unsecured creditors whose claims are
> small in relation to those of the secured creditors;
> (3) the debtor's one asset is the subject of a foreclosure
> action as a result of arrearages or default on the debt;
> (4) the debtor's financial condition is, in essence, a two
> party dispute between the debtor and secured creditors
> which can be resolved in the pending state foreclosure
> action;
> (5) the timing of the debtor's filing evidences an intent to
> delay or frustrate the legitimate efforts of the debtor's
> secured creditors to enforce their rights;
> (6) the debtor has little or no cash flow;
> (7) the debtor can't meet current expenses including the
> payment of personal property and real estate taxes; and
> (8) the debtor has no employees.

---

[17] Alternatively, "cause" to lift the stay under section 362(d)(1) of the Bankruptcy Code may be found if a debtor's actions in the case are in bad faith, utilizing the same standard of bad faith applied to determine whether a case should be dismissed under 11 U.S.C. § 1112(b).  <u>Eclair Bakery Ltd.</u>, 255 B.R. at 138 (citing <u>234-6 W. 22nd St. Corp.</u>, 214 B.R. at 757).

113 F.3d at 1311-12 ("For such two-party disputes, the state court, which has been overseeing the case, is a preferable forum.").

107.    This case is analogous to In re Kaplan Breslaw Ash, LLC, 264 B.R. 309 (Bankr. S.D.N.Y. 2001), where that court dismissed the debtor's bankruptcy case for the following reasons:

> (1) This case is for all practical purposes a two-party dispute between the Debtor and the Mortgageholder;
> (2) This case was filed as a tactical step in connection with the Debtor's battles with the Mortgageholder, to sidestep the Debtor's obligations for money that was actually borrowed, and used by the Debtor in the manner that the Debtor had intended;
> (3) This case was filed for the predominant purpose, if not the sole purpose, of blocking measures by the Mortgageholder to foreclose on the Warehouse, and in particular to utilize the automatic stay provided by section 362 of the Bankruptcy Code with respect to the Warehouse to block Mortgageholder remedies;
> (4) The Debtor sought to exploit section 362's automatic stay not for a temporary "breathing spell," but, rather, as a means to maintain ownership of the Warehouse without satisfying the debt associated with it, and to effect delay, and, if possible, a total blockage, of Mortgageholder remedies;
> (5) The timing of the Debtor's filings evidences an intent to hinder, delay and/or frustrate the legitimate efforts of the Mortgageholder to enforce its rights; and
> (6) Unsecured creditors would not benefit in any material way as a consequence of the filing, or be prejudiced, in any material way, by relief from the stay.

Id. at 320-21.

108.    Similarly, here: (1) the Debtor has a single asset, the Property; (2) the Debtor has few unsecured creditors, whose claims are small in relation to 71CSA's claims; (3) the Property is the subject of the Foreclosure Action; (4) the Debtor's financial condition is related to a two-party dispute between the Parties, which has been promptly resolved in the Foreclosure Action; (5) the Debtor demonstrated an intent to delay by initiating the Bankruptcy Case on the day prior to the foreclosure sale, which indicates the Debtor's intent to frustrate the legitimate efforts of

71CSA to enforce its rights under the Consolidated Obligations; (6) the Debtor already has demonstrated that it cannot meet its current expenses, most notably, its mortgage payments; (7) the Debtor has failed to make any progress in this Bankruptcy Case and has failed to secure a purchaser for the Property; (8) the Debtor has misrepresented the total amount of its debts and liabilities; and (9) the Debtor has failed to appear for a deposition or produce documents in response to a subpoena.

109.    Finally, this Bankruptcy Case is, in essence, a two-party dispute as is evidenced by the Foreclosure Action.  The Debtor primarily commenced this Bankruptcy Case in order to halt the foreclosure sale.  Courts within the Second Circuit routinely dismiss bankruptcy petitions where the underlying bankruptcy case is a two-party dispute.  See Bridge to Life, Inc. v. Lucadamo (In re Bridge to Life, Inc.), CV-05-5499 (CPS), 2006 U.S. Dist. LEXIS 29652, at *22 (E.D.N.Y. May 16, 2006) ("[I]t is clear from the [Bankruptcy Court's] decision denying [the Debtor's] motion for reconsideration that Bankruptcy Judge Feller intended to bar [the Debtor] from filing future petitions as weapons in this two-party dispute."); cf. In re Syndicom Corp., 268 B.R. 26, 31 (Bankr. S.D.N.Y. 2001) (finding cause for dismissal of the bankruptcy case where "the invocation of the jurisdiction of the Bankruptcy Court [to adjudicate a two-party dispute] was improper – particularly insofar as it had the effect (and, the Court finds, the purpose) of preserving the [tenants'] right to occupy an apartment leased in the name of a shell corporation.").

110.    Prolonging this Bankruptcy Case when the Debtor has no prospect for a rehabilitation and where there is no imminent sale of the Property only serves to benefit the Debtor while 71CSA continues to be prejudiced.  The Court should not allow the Debtor to continue holding 71CSA hostage at the expense of all creditors.

111.    Therefore, if this Court declines to grant 71CSA stay relief, the Bankruptcy Court should conclude that 71CSA has established cause to dismiss the Bankruptcy Case under § 1112(b) of the Bankruptcy Code.

112.    Should the Court find cause to dismiss the Bankruptcy Case under § 1112(b) of the Bankruptcy Code, 71CSA respectfully submits that such dismissal should be with prejudice for one hundred and eighty days so that 71 CSA may conclude the foreclosure sale of the Property.    Otherwise, a dismissal without prejudice might result in the Debtor refiling a bankruptcy case on the eve or day of a foreclosure sale, and the Parties having to again appear before this Court.    Accordingly, 71 CSA requests that the Bankruptcy Case be dismissed with prejudice to the Debtor refiling for bankruptcy protection under any chapter of the Bankruptcy Code for one hundred eighty days from the date of entry of the order of dismissal.

## WAIVER OF FED. R. BANKR. P. 4001(a)(3)

113.    If the Court grants 71CSA's request for relief from the automatic stay under 11 U.S.C. §§ 362(d)(1) and/or 362(d)(3), the Court should waive the fourteen day stay under Fed. R. Bankr. P. 4001(a)(3) as such stay would unduly prejudice 71CSA.    Any further delay would defeat 71CSA's ability to adequately protect its interests in the Property.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, the Court should grant the Motion in its

entirety, and grant 71CSA such other and further relief as may be just and proper.

Dated:    New York, New York
          April 20, 2015

                              PRYOR CASHMAN LLP


                              By:_____/s/ Seth H. Lieberman_____
                                    Seth H. Lieberman
                                    Conrad K. Chiu
                                    Robert M. Fleischer
                              7 Times Square
                              New York, New York 10036-6569
                              Telephone: (212) 421-4100
                              Facsimile: (212) 326-0806
                              slieberman@pryorcashman.com
                              cchiu@pryorcashman.com
                              rfleischer@pryorcashman.com

                              Attorneys for 71 Clinton Street Apartments LLC

## VERIFICATION

GREGORY GLEASON, of full age, hereby certifies as follows:

1.      I am the Director of Finance of Corigin Real Estate Group LLC, which is the

parent of Corigin Apartments LLC, which is a member of Corigin Manhattan Apartments I LLC,

which is the sole member of 71 Clinton Street Apartments LLC ("71CSA"). I am authorized to

sign this verification on behalf of 71CSA; as such, I have various financial and other

responsibilities for 71CSA which acquired the mortgages being foreclosed in the Foreclosure

Action (as defined in the Motion) on June 2, 2011 from People's United Bank, as successor by

merger to Bank of Smithtown, pursuant to an Assignment of Mortgage. Accordingly, I am fully

familiar with the facts and circumstances herein contained as relates to said mortgages, from the

assignment thereof to 71CSA by People's United Bank, as successor by merger to Bank of

Smithtown, to the present.

2.      I am authorized to make this verification on behalf of 71CSA. I have personal

knowledge of the facts and circumstances and would so testify if called as a witness.

3.      I have read the foregoing Motion. All of the facts set forth in Paragraphs 9-40 are

true, except those alleged on information and belief, in which case I believe them to be true.

I hereby certify under penalty of perjury under the laws of the United States of America

that the foregoing statements are true and correct.

Executed at New York, New York, on April 20, 2015

GREGORY GLEASON

33